STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

COUNTY OF FORSYTH    ⁷²⁵ JAN 29 ◯ ⅼ 16    FILE NO. 25CVS 587

FORSYTH CO., C.S.C.

BY _____

```
                                    )
BECKY MUSSAT-WHITLOW                )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )          COMPLAINT
                                    )
WINSTON-SALEM STATE                 )
UNIVERSITY.                         )
                                    )
        Defendant.                  )
                                    )
                                    )
```

---

The Plaintiff, Becky Mussat-Whitlow, complaining of Defendant alleges the following:

## NATURE OF ACTION

1.    Plaintiff has instituted this action pursuant to claims arising under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, rights and claims arising under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*, and the public policy of the laws of the State of North Carolina to recover damages for the violations of her civil rights and North Carolina Common law.[1]

---

[1] The Plaintiff also has claims pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12111, *et seq., as amended,* (hereafter "ADA"), Title VII of the Civil Rights Act, 42 U.S.C. § 2000, *et seq. as amended* (hereafter Title VII), and the Age Discriminaiton in Employment Act, 29 U.S.C. 621, *et seq.* (hereafter ADEA) and for retaliation which are currently pending at the Equal Employment Opportunity Commission (EEOC) with EEOC Charge No. 435-2023-01164. See also ¶¶ 49-55.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over this action pursuant to the laws of the State of North Carolina.

3.      Venue is proper in Forsyth County, North Carolina because Plaintiff is a resident of Forsyth County, and has resided there throughout her employment and the relevant timeframe related to this litigation.

## PARTIES

4.      The Plaintiff, Becky Mussat-Whitlow, a 51-year-old female, is a resident of Forsyth County, North Carolina. At all times pertinent to this action the Plaintiff was an "employee" of Defendant within the meaning and definitions of FMLA, ADA, and the laws of the State of North Carolina.

5.      The Defendant Winston-Salem State University (hereafter "The University or "Defendant") is a corporation established under North Carolina law, which operates a public university in Winston-Salem, North Carolina, offering undergraduate and graduate degree programs for its students. At all times pertinent to this action, Defendant employed over 500 employees, and was the "employer" of Plaintiff within the meaning and definition of the FMLA, ADA, 42 U.S.C. § 12111(4) and the common law of North Carolina.

## SOVEREIGN IMMUNITY

6.      Sovereign immunity is waived by Defendant pursuant to N.C. Gen. Stat. § 143-300.35.

## FACTS

7.     Plaintiff was initially employed by Defendant in or around 1999. Plaintiff was continually promoted or given additional job responsibilities as her career and employment with Defendant progressed.

8.     Plaintiff's title at the time of her termination was Director of Institutional Assessment and Research, which she held starting in 2009.

9.     In her role, Plaintiff's job duties included leading institutional effectiveness efforts and the internal and external reporting of data.

10.     Plaintiff also created mechanisms and procedures to ensure that Defendant's data was used to make institutional improvements.

11.     Since her hire in 1999, Plaintiff has consistently met or exceeded all reasonable expectations of her position.

12.     As a result of her excellent performance, Plaintiff was continually given raises or additional compensation as a result of her excellent performance.

13.     At the time of her termination, Plaintiff was performing all the essential functions of her position.

14.     Plaintiff was never placed on any type of performance improvement plan or informed in writing that her performance was not meeting or exceeding the reasonable expectations of her role.

15.     For over 22 years, Plaintiff reported to Dr. Caroline Berry, who served as the Senior Associate Provost. Ms. Berry retired in June, 2021.

16. In or about early 2022, Dr. Tony Artimisi was appointed as Plaintiff's interim supervisor. Dr. Atimisi and Plaintiff worked together for several years, and knew one another through work on various committees for Defendant.

17. Dr. Artimisi would often visit Plaintiff's office and make comments that Plaintiff believed were inappropriate or not related to their respective job duties. Dr. Artimisi, and her other co-workers, were aware that Plaintiff was going through a separation and divorce during the last year of her employment.

18. It was often joked or discussed among employees of Defendant that Dr. Artimisi was romantically and sexually interested in Plaintiff. Plaintiff did not find the jokes or insinuations funny.

19. Dr. Artimisi made it known to Plaintiff that he had gone through a divorce and was no longer married. Plaintiff did not have any romantic interest in Dr. Artimisi and made it known to him and others that Plaintiff viewed their relationship as strictly professional.

20. Dr. Artimisi would make inappropriate comments to Plaintiff or statements that had innuendo that Plaintiff thought was unsuitable for the workplace and as her supervisor. This included a reference at a work event in February 2022 that Plaintiff "*liked it spicy.*" Also, on several occasions Dr. Artimisi would reference and invite Plaintiff to personal events or get-togethers that were in no way related to work. This made Plaintiff uncomfortable, and Plaintiff tried to focus their conversations back to work-related tasks.

21. On or about August 30, 2022, Plaintiff received notification that she was "terminated." Plaintiff was shocked by the communication of her alleged termination and immediately contacted Defendant's leadership.

22.     Plaintiff received a call from the Defendant's Provost that evening to apologize and ensure Plaintiff that the termination was a "mistake," and he would determine how such a mistake occurred. Aside from the Defendant's leadership notifying Plaintiff that she was "accidentally" terminated, and quickly reinstating her, no further explanation was ever provided despite Plaintiff's requests.

23.     When Plaintiff spoke with Defendant's Human Resources (HR) regarding the "accidental" termination, she asked Defendant to investigate this issue. After this incident, her work environment became increasingly hostile and no details were ever provided to her.

24.     Beginning in or about September 2022 until her termination, Plaintiff was increasingly cut off from conversations with Defendant's leadership and her peers. She was not selected or appointed to committees for which she was typically selected for, and responsibilities taken from her related to Title III responsibilities and other job duties she had historically performed for Defendant.

25.     Additionally, requests from Defendant's leadership which would typically come through her were directed to her staff and subordinates. It was clear Plaintiff was being circumvented, which impacted her ability to perform her job duties and management of her team. Plaintiff's direct reports began asking her questions about Defendant's actions.

26.     In October 2022, Plaintiff discussed taking FMLA leave to have surgery for her torn meniscus and foot that she had put off due to the Covid-19 Pandemic.

27.     Plaintiff's torn meniscus and issue with her foot were qualifying and serious medical conditions under FMLA and ADA. These medical conditions impacted major life activities, including prolonged standing, walking, and her everyday mobility.

28.     Dr. Artimisi initially informed her there would be no problem with her taking such leave and when she knew the specific dates to simply file the paperwork as she had sufficient time.

29.     Around the same time, in October 2022, an email was sent by Dr. Artimisi about Plaintiff allegedly *"interrupting him during a meeting."* The assertion was vague and false. This false allegation and change in treatment by Dr. Artimisi came after Plaintiff had made it known she was not romantically interested in Dr. Artimisi and the disclosure of her upcoming medical procedures and need for medical leave.

30.     Plaintiff felt that the negative statement about her work was related to her communications and actions indicating she did not want to engage in a personal or romantic relationship with him outside of work.  Additionally, Plaintiff felt the statements were connected to her upcoming medical procedures and approved time off for her surgical procedure.

31.     Plaintiff filed the necessary paperwork pursuant to the ADA and FMLA for her upcoming medical procedure and associated leave, and notified Defendant's Human Resources. Planitiff's medical leave began on or about October 22, 2022 for the above-referenced procedure.

32.     When Plaintiff's doctor's note allowed her to return to work in person, she began to be subjected to increasingly more negative age-related comments and her work environment became more hostile.  Meetings with Dr. Artimisi became less regular and communications with the Provost were not regularly answered.

33.     Plaintiff was hospitalized from December 19, 2022, to January 2, 2023, due to a mental health issue. She was diagnosed with Post-Traumatic Stress Disorder (PTSD) and Defendant was aware of her serious and qualifying medical conditions and disability which impacts major life activities, including concentrating and focusing.

34.     Plaintiff returned back to work on January 2, 2023. She was able to perform all of her job functions and duties upon her return without restriction.

35.     Upon return, it was clear to Plaintiff that she was treated differently than before her federally protected and approved medical leave.  Plaintiff was further isolated by her supervisors and other members of Defendant's leadership from meetings and events related to her job she had previously and routinely been included in.

36.     On or about January 19, 2023, Defendant announced that their Institutional Assessment and Research Office (IAR) office would be relocated without her being informed in advance.

37.     Plaintiff was shocked that she was not given any formal notice prior to an announcement to the broad Provost leadership group.

38.     In the last several months of her employment, she was consistently asked about "succession plans" and plans about her retirement. These comments implied and referenced her age, despite Plaintiff's stated plans to continue working with Defendant through the foreseeable future. When repeatedly asked by Defendant, she answered that she desired to continue to work for years to come.

39.     Additional jokes and comments were made about her need for eye surgery in the last months of her employment, in which Dr. Artimisi joked that eye surgery was only needed for someone that was elderly and analogized it to a cataract surgery. Plaintiff is severely near-sighted, and it causes migraines along with vision issues. An upcoming eye surgery was intended to alleviate those issues.

40.     In the weeks and months preceding her termination, Defendant and her direct supervisor made multiple comments about her physical and mental health.

41.     The discrimination and retaliation that Plaintiff suffered from Defendant exasperated her medical and physical conditions, and caused substantial emotional distress. Defendant further failed to take the proper actions to stop and prevent further harassment and retaliation as a result of her disabilities and required medical leave pursuant to FMLA and the ADA.

42.     Plaintiff was terminated from employment by Defendant on January 30, 2023.

43.     Plaintiff was never put on any sort of performance-improvement plan, and Plaintiff's termination was in contravention of Defendant's policies and procedures.

44.     At the time of her termination, Plaintiff was performing her job duties at or above the reasonable expectations of Defendant.

45.     When Plaintiff went to retrieve her last paycheck following, another employee asked if Plaintiff "*was feeling crazy today*?"

46.     Upon information and belief, Plaintiff's medical diagnoses were shared with colleagues and employees in the weeks leading up to her termination.

47.     Following her termination, her job duties and responsibilities subsequent to her termination have been given or assigned to substantially younger employees, including male employees, with less experience than Plaintiff.

48.     Plaintiff has suffered harm, including economic and personal losses, as a result of the disparate treatment and termination of her employment effective January 30, 2023. Plaintiff's economic losses continue to mount, including losses to her retirement and benefits as a result of the unlawful termination.

## ADMINISTRATIVE REMEDIES

49.     On or about June 6, 2023, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) in Greensboro, North Carolina, Charge No. 435-2023-01164, against Defendant. Plaintiff's charge alleged disability, gender, and age discrimination and retaliation.

50.     On January 13, 2025, Plaintiff, through counsel, requested her Right to Sue in the above-referenced EEOC Charge.

51.     Plaintiff, through counsel, has been informed that the EEOC Investigation Unit is in the process of closing the Charge, but has not issued a Right to Sue as of the date of this filing.

52.     Following receipt of Plaintiff's Right to Sue, Plaintiff intends to amend or supplement her claims pursuant to Title VII, ADEA, ADA and retaliation claims following the exhaustion of all procedural prerequisites.

53.     Plaintiff, through counsel, has been informed that the EEOC Investigation Unit is in the process of closing her Charge, but has not issued a Right to Sue as of the date of this filing.

54.     Following receipt of Plaintiff's Right to Sue, Plaintiff intends to amend or supplement her claims pursuant to Title VII, ADEA, ADA and retaliation claims following the exhaustion of all procedural prerequisites to filing those claims.

### FIRST CLAIM FOR RELIEF
### Termination in Violation of Public Policy- Disability Discrimination in violation of N.C.G.S. § 143-422.1 *et. seq.*

55.     Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

56.     The public policy of the State of North Carolina protects employees from discrimination based on either having or being regarded as having a disability.

57.     Defendant, in contradiction to the public policy of the state, discriminated against Plaintiff by refusing to accommodate her, not meeting with her to discuss possible accommodations, and ultimately terminating her as a result of her disability or regarding her as having a disability.

58.     Defendant violated the public policy of North Carolina in their termination of Plaintiff's employment because of her disability or handicap. N.C.G.S. § 143-422.1. *et. seq.*

59.     As a proximate result of Defendant's discharge of Plaintiff in violation of public policy, Plaintiff has suffered substantial damages, including lost income and benefits, emotional distress and mental anguish, loss of quality of life and reputation; and other damages to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Termination in Violation of Public Policy- Age Discrimination in violation of N.C.G.S. §**
**143-422.1 *et. seq.***

60.     Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

61.     The public policy of the State of North Carolina protects employees from discrimination based on age.

62.     Defendant, in contradiction to the public policy of the state, discriminated against Plaintiff on the basis of her age through their actions, including in the termination of Plaintiff's employment.

63.     Defendant violated the public policy of North Carolina in their termination of Plaintiff's employment because of her age. N.C.G.S. § 143-422.1. *et. seq.*

64.     As a proximate result of Defendant's discharge of Plaintiff in violation of public policy, Plaintiff has suffered substantial damages, including lost income and benefits, emotional distress and mental anguish, loss of quality of life and reputation; and other damages to be proven at trial.

### THIRD CLAIM FOR RELIEF
### Termination in Violation of Public Policy- Sex Discrimination in violation of N.C.G.S. § 143-422.1 *et. seq.*

65.     Plaintiff hereby incorporates the foregoing paragraphs as if fully set forth herein.

66.     The public policy of the State of North Carolina protects employees from discrimination based on sex.

67.     Defendant, in contradiction to the public policy of the state, discriminated against Plaintiff on the basis of her sex, female, through their actions, including in the termination of Plaintiff's employment.

68.     Defendant violated the public policy of North Carolina in their termination of Plaintiff's employment because of her sex, female, N.C.G.S. § 143-422.1. *et. seq.*

69.     As a proximate result of Defendant's discharge of Plaintiff in violation of public policy, Plaintiff has suffered substantial damages, including lost income and benefits, emotional distress and mental anguish, loss of quality of life and reputation; and other damages to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### Claims for Violations of FMLA for Interference and Retaliation

70.     Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

71.     At all times pertinent to this action, Plaintiff was an "eligible employee," as defined in 29 U.S.C. § 2611(2), entitled to the benefits and protection of the FMLA.

72. The FMLA requires that an eligible employee with a "serious health condition," as defined in 29 USC § 2612(a), receive protected leave up to 12 weeks per year.

73. Plaintiff was entitled to the benefit and protection afforded by FMLA.

74. Plaintiff provided notice of her need to take FMLA for a serious medical condition, and provided the necessary documentation for her FMLA leave.

75. Defendant was on notice of and was aware of Plaintiff's "serious health condition" as defined by FMLA, 29 USC § 2612(a) and her need for FMLA during the course of her employment at the time of her termination on January 30, 2023.

76. Starting October 22, 2022, Plaintiff was compelled to request leave due to her "serious health condition," as defined in 29 USC § 2612(a), which Defendant was aware of months prior to termination. Additionally, Plaintiff took other FMLA protected leave as a result of serious health conditions which are described herein.

77. Defendant discriminated and retaliated against Plaintiff for exercising her right to take leave under the FMLA by subjecting her to disparate treatment, and ultimately terminating her employment on January 30, 2023.

78. Defendant interfered with Plaintiff's benefits and protections provided under the FMLA by subjecting her to discrimination and ultimately terminating her employment on January 30, 2023 in violation of the FMLA.

79. Plaintiff was prejudiced and harmed by Defendant's interference with her rights and benefits under FMLA including in her compensation and in the termination of her employment on January 30, 2023.

80. Defendant subjected Plaintiff to retaliation as a result of engaging in protected activity, including exercising rights and benefits under the FMLA. The retaliation and adverse

actions included disparate treatment causing economic and personal losses, and Plaintiff's ultimate termination on January 30, 2023.

81.    Defendant's actions in interfering and retaliating against Plaintiff were intentional, willful, wanton with a knowing and/or reckless disregard for the rights of Plaintiff.

82.    As a proximate result of Defendant's discrimination and retaliation against Plaintiff under the FMLA, Plaintiff has been prejudiced and suffered substantial damages and is entitled to reinstatement, compensatory damages, liquidated damages and attorneys' fees for her representation herein, pursuant to the FMLA, 29 U.S.C. § 2617(a).

**PRAYER FOR RELIEF**

Plaintiff hereby requests the following relief:

1.    That Plaintiff recover of Defendant back pay and restoration of all benefits;

2.    That Plaintiff recover of Defendant compensatory damages in an amount in excess of $100,000.00;

3.    That Plaintiff recover of Defendant punitive damages in an amount to be determined by the jury;

4.    That Plaintiff recover the costs of this action, including reasonable attorneys' fees for her representation herein, as required by 42 U.S.C. §12117(a) and 42 U.S.C. § 2000ff-6(a)(2);

5.    That Plaintiff recover pre-judgment and post-judgment interest on all damages awarded herein; and

6.    That this Court grant such other relief deemed just and appropriate.

**Request for Jury Trial**

Plaintiff hereby demands a trial by jury on all issues presented herein.

This the 29th day of January, 2025.

Daniel C. Lyon
N.C. State Bar No. 43828
Elliot Morgan Parsonage, PLLC
300 E. Kingston Ave., Suite 200
Charlotte, NC 28203
Telephone: 704-707-3705
Facsimile: 336-724-3335
Email: dlyon@emplawfirm.com
*Attorney for Plaintiff*